(C. D. 1512)

## GUY B. BARHAM CO. FOR THE ACCOUNT OF JOHN ARCONTI v. UNITED STATES

United States Customs Court, Third Division

(Decided April 1, 1953)

*Lawrence, Tuttle & Harper* (*Walter I. Carpeneti* and *George R. Tuttle* of counsel) for the plaintiff.

*Charles J. Wagner*, Acting Assistant Attorney General (*Joseph E. Weil, William J. Vitale*, and *Daniel I. Auster*, special attorneys), for the defendant.

Before EKWALL and JOHNSON, Judges

JOHNSON, Judge: The merchandise in question in this action consists of certain pottery imported from Mexico. Duty was assessed

thereon under the provisions of paragraph 211 of the Tariff Act of 1930, as amended by the trade agreement with Mexico, T. D. 50797, providing, so far as applicable, as follows:

| Tariff Act of 1930 paragraph | Description of article | Rate of duty |
|---|---|---|
| 211 | Earthenware and crockeryware composed of a nonvitrified absorbent body, including white granite and semi-porcelain earthenware, * * * and all other articles composed wholly or in chief value of such ware; any of the foregoing which is earthenware having a body not artificially colored and composed wholly of clay, whether or not of a class or kind specified in any previous trade agreement concluded under the provisions of section 350 of the Tariff Act of 1930:<br>  *   *   *   *   *   *   *<br>Painted, colored, tinted, stained, enameled, gilded, printed, ornamented, or decorated in any manner, and manufactures in chief value of such ware, not specially provided for.<br><br>   *Provided,* That if the body of such ware is covered wholly or in part with an engobe or a body slip, the engobe or body slip shall for the purposes of this provision be considered a part of the body. | 5¢ per doz. pieces, and 25% ad valorem |

The plaintiff claims that the merchandise is properly dutiable under the provisions of paragraph 210 of said act, as amended by said trade agreement, T. D. 50797, providing as follows:

| Tariff Act of 1930 paragraph | Description of article | Rate of duty |
|---|---|---|
| 210 | Common yellow, brown, red, or gray earthenware, plain or embossed, composed of a body wholly of clay which is unwashed, unmixed, and not artificially colored; * * * all the foregoing:<br>  *   *   *   *   *   *   *<br>Ornamented, incised, or decorated in any manner, and manufactures wholly or in chief value of such ware, not specially provided for. | 10% ad valorem |

John Arconti testified that he was the plaintiff and the sole owner of the importing firm and that he personally purchased the merchan-

dise in question in Mexico and had observed similar merchandise made in the place of purchase for a period of over 2 weeks. Two entries are involved in this action. The invoices included in these entries list many kinds of articles. However, none of the items appear in the English language upon the invoices. Samples were produced at the trial by the importer and marked in evidence for identification as exhibits 1 to 8, inclusive. The importer was then shown exhibit 2 for identification and asked if there was any merchandise similar thereto on either of the two invoices. The witness identified it on invoice as "opacos" and testified that it appeared under the name "Anforas grandes." Exhibit 7 was later described by him as having been painted, fired, and polished with sandpaper or pumice stone to shine it up, and that such ware appeared on the invoice as "brunido." He testified that exhibits 1, 3, 4, 5, 6, 7, and 8 were made in the same manner as exhibit 2 except for a difference in the cooking; that exhibit 2 was painted with water colors, without further firing, while the remainder of the articles had the same type of coloring, except that they had been fired and polished. With the exception of exhibits 2 and 7, none of the other samples was identified by invoice descriptions. However, counsel for the plaintiff offered all of the exhibits for identification in evidence, stating:

Mr. Gulick has suggested that I offer all of these at this time as plaintiff's exhibits. I make that offer at this time.

Counsel for the Government entered "no objection" to the offer and the items were marked in evidence. Although there is no evidence that any of the items admitted were a part of the imported articles, since Mr. Gulick, a customs official at the port of Los Angeles, and the Government counsel consented to the inclusion thereof as a part of the record, it is presumed that such exhibits represent the various types of articles imported. The exhibits may be described as follows:

Exhibit 1 is an 8-inch plate. The top side thereof is glazed, after having received a brownish-colored slip or engobe decorated with various designs in tan and green. The bottom of the plate shows a reddish tint, and where the plate is broken, it is observed that the interior portions of the ware are of a lighter tan.

Exhibit 2 consists of five broken pieces of pottery. The pieces on one side are decorated with blue, green, white, and red designs. No glaze appears thereon and the background of the broken article, upon the surfaces, appears to be the same color as the interior of the pieces, except the center of such cross-section which is very dark gray or black in color. The article, whatever it represented, is primitive in design and workmanship.

Exhibit 3 is a water carafe, a very light gray-colored article, having various decorations on the upper portion. Although the exterior of the vessel is practically the same color as the interior, it appears to be

a trifle lighter shade and is much smoother in texture, presenting the appearance of having a light film of material over it before it had been fired.

Exhibit 4 represents what apparently was originally, before being broken, a water pitcher. It appears to be made of the same light-gray clay as exhibit 3, and the outer surfaces are decorated with brownish-red designs. Although the interior surfaces of the article are quite rough, the outer surface background thereof appears to have a light film of material over it, making it much smoother and presenting a finished gloss similar to exhibit 3, although it is not glazed.

Exhibit 5 is a pig bank composed of what appears to be the same light-gray clay as exhibit 3. It has been decorated on the outside to represent the markings of a pig, certain portions thereof have been colored yellow, and the article is glazed.

Exhibit 6 is a small enclosed pot, having a handle on top, a short spout on one side, and on the reverse side a small hole about a half inch in diameter. It appears to be made of the same material as exhibit 3, is decorated in the same manner as exhibit 4, and has the same smooth finish.

Exhibit 7 is a small flower pot having three short legs. It appears to be made of the same grayish clay as exhibit 3. The outer surfaces are decorated in various colors and designs and have the same smooth finish as exhibit 3.

Exhibit 8 is a small one-cup sized carafe. It appears to be made of a grayish-brown clay, the outer surfaces being decorated in conventional designs of various-colored browns, and has a smooth glossy finish similar to exhibit 3.

The witness described the samples as follows: Exhibit 1 is a plate to eat from, exhibit 2 is a water container, exhibits 3 and 4 are used to dispense water, exhibit 5 is a savings bank, exhibit 6 is a water bottle, exhibit 7 is a flower pot, and exhibit 8 is a water bottle. The witness had seen the articles similar to exhibit 3 used as a water bottle in Tucson and similar to exhibit 6 used in a Chinese laundry to blow water on clothes. He had never observed any of the items used on a mantelpiece or a knickknack cabinet for decorative purposes.

The record in the case of *Arconti Hardware Co.* v. *United States,* 73 Treas. Dec. 833, T. D. 49573, was incorporated in the record in this case by consent of counsel for both sides, and the same witness, who testified in this case, also testified in the incorporated record. Government counsel cross-examined the witness upon the record in that case.

The testimony of John Arconti in this case and on cross-examination in the incorporated case relative to the source of the clay, the clay itself, and the method of manufacture, is somewhat contradictory. It may be summed up as follows: The clay is gathered from the closest

river to the homes of the houseworkers. Such workers gather clay from river banks in big pieces in sacks. "They each gather their clay from their back yards, which would be in the washes. See, those yards extend right to the wash." The Tlaquepaque pit was described as "in the whole State of Jalisco, not just the city of Tlaquepaque." The clay is gathered in any part of the State of Jalisco, it is the same type of black clay, and such "pits are not small pits, like we would imagine they would be; they are large pits." "This clay is taken from one pit which is only one color, or the other * * * which-ever pit it comes from," but in the same pit one may obtain 15 shades of red, 15 shades of gray, and 15 shades of white, according to the amount of iron that is gathered in the clay, and the natives bring the clays in that way. "When we speak of black that does not necessarily mean black as black as could be; your gray has shades of grays also. You may have a light gray and a dark gray, and a gray dark enough to be a black." One does not shovel out black clay and then gray clay "this pit in Tlaquepaque is black clay." The particular clay of which the articles in question were made was "sort of a black."

The clays are known as "pegosa" and "nonpegosa." The "pegosa" clay is a clay, and the "nonpegosa" is a dirt resembling clay, but has no clay in it, but the "pegosa" and the "nonpegosa" come from the same source. The "nonpegosa" is a clay that the water has washed out of the river bed and left just the sand part, but it is still the same clay. The rain washes out the heavy clays, and the workers put them back together again. The "pegosa" and the "nonpegosa" are the same clay separated by nature and are only put back together again in making the article. The "nonpegosa" clay comes by rain-fall as the rain washes out the heavy clays. The "pegosa" and "nonpegosa" clays are used in making exhibit 2 as the "pegosa itself will not make a clay" so the two are put back together again and come from the same family. The witness had never seen a red clay shoveled out of the pits. When previously asked if exhibit 2 was made from "pegosa" or "nonpegosa" clay, the witness stated that it was "a pegosa if anything at all," and it was "not made of nonpegosa clay."

X Q. Might it not be a mixture of pegosa and nonpegosa clay?—A. If it was mixed, it would be a mixture.

X Q. Is there any non-pegosa clay in Exhibit 2?—A. I would say, no.

The imported articles were manufactured, according to the witness, in manner following: The clay is broken up in small pebbles, mixed with water, and then worked into a consistency for molding into forms. These are allowed to dry after which they are "fired and put into different types of pottery." The pottery is made out of one type of clay only. The gray clay and the black clay are all the same

clay. The black indicates it has been fired once, and the variations of color in the clay occur because of the second firing. The clay is worked right at the start without filtering and there is no mixture. The witness did not observe that the powdered clay, in being prepared to make the articles, was made of equal parts of black and white clays. The clay was taken from one pit which was only one color. The different colors of the body develop in the firing. As it comes from the pit, the clay is all black, but when it is fired, the color changes, depending on the oxides in the clay. After the clay is pulverized, water is added to make the articles. When asked if the articles were dipped in a clay slip, apparently the witness did not understand the method of slipping in the manufacture of pottery, that is, adding another colored clay over a clay body, for the reason that he thought that "slipping" meant a method of mass production. The witness accounted for the change in color in exhibit 1, shown by the cross-section, where the piece had been broken, and the outside surface of the article, by the firing. He stated "The outside will be closer to the fire than the inside, which would change your colors. If that Exhibit 1 would be fired at a great heat it would also change that surface color." It was the amount of firing which determined the color and the shrinkage.

In the long standing controversy relative to the proper classification of Mexican pottery ware, the Government, apparently for the first time, called a witness to testify in rebuttal who had visited the locality in Mexico where the Indians make the pottery in question. He visited several clay pits and observed workers forming pottery in their homes from the commencement of the work until the finished product was produced. He also had interrogated many workers in the town of Tlaquepaque, State of Jalisco, Mexico, as to their methods, and had further inquired into the history of the pottery industry carried on by the Indians of this district and found that the industry had proceeded with the same methods for centuries past. Joseph E. Couchon, Treasury representative, conducting the investigation, testified substantially as follows:

The witness visited three of the principal clay pits in the district. The pits were known as the Zalatitan, the El Camuchin, and the Huentitan. They were located 3 or 4 miles out of town and possibly a mile and a half to 2 miles apart. He observed the clay in the pits and the manner of removal. He was informed that there were many pits in the district, but they were all alike, except the pit known as the Pueblo de Santa Cruz, which was close to Tonala. This pit he also visited and found it contained an entirely different kind of clay which was completely red. The clay in the other pits he visited were black and white but in separate layers. The witness also talked with many of the workers in the district and learned that the processes of manu-

facture of the pottery by the Indians were all alike and the same proc-
esses had been employed for generations.

The clay pits he visited consist of excavations into the side of hills
and do not consist of holes dug down into the ground.   The openings
of the pits are from 20 to 25 feet in width and about the height of a
man.   The distances from the mouth of the pit to where the workers
were digging varied from 10 to 12 feet at the time of his observation.
The workers follow the vein of clay which would appear, disappear,
and reappear again.   If, however, it disappeared into the ground
beneath the pit, the workers would not follow it down.   The vein of
clay is followed into the hill, but if the workers go too deeply into the
side, ofttimes the roof caves in and some of the workers are injured
or killed.

In the pits having the black and white clay, the top layer consists
of the white clay and is identified by the name "Barro Tięso Blanco,"
which means hard white clay.   It is also known as "nonpegajoso,"
meaning not sticky.   The bottom layer is black clay and is called
"Barro Negro Pegajoso," meaning black, sticky.   The top layer is a
pure white clay but the bottom layer of clay, where it meets the white,
is not as black as further down nearer the bottom of the vein.   It has
the appearance "as if a bit of liquid had gradually seeped through or
settled through some way down where the bottom was darker than
where the two layers met."   Right at the meeting point, the clay is
gray for a few inches.   All of the veins have these two-colored layers,
and they are not uniform in color all the way through.   Wherever
the two layers meet, the clay would be a mixture of the two.   The
difference between the black and the white clay, besides color, is that
one is sticky and the other is not.

The workers extract the clay from the walls of the vein with pick
and shovel.   The black and the white clays are taken out separately
and placed in separate bags.   They are then loaded separately upon
burros.   The bags containing the lumps of black clay and the lumps
of white clay are taken to the homes of the workers and dumped in
their patios.   The clay is then spread out to dry in the sun.   The
lumps of white clay and the lumps of black clay, presumably after
drying, are practically the same color.   The witness, during his inves-
tigation, did not see any river banks, creeks, or washes, nor clay pits,
in the backyards of the workers where the clay was obtained, such
as were described by the plaintiff's witness.   On the other hand,
from his personal knowledge, all of the Indian workers obtained their
clay from pits such as he had observed.   These patios, where the
Indians work, are formed from the walls of four houses built around it.
It is in the form of a hollow square.   One could not walk out of one
of these houses into the backyards because the walls of the houses
enclose the patios.   That is to say, the patio is the central open
portion around which the four walls of the homes are built.

After the clay is completely dried, it is mixed 50 percent white and 50 percent black. It is then ground, by means of a stone against the hard patio floor, into a fine powder. The powdery clay is then passed through a sieve, located on one side of the patio, and placed at an angle of 45 degrees. The clay is thrown against the sieve and whatever goes through is pure clay, mixed 50 percent white, 50 percent black. The clay is then ready for use.

A little water is added to the mixed clay until it is of the desired consistency. The articles are then fashioned from it by hand. Standard articles like cups and saucers are made in molds. After the articles are so formed, they are put out in the sun to dry. After the article is fashioned with the clay and it has dried, the color is somewhat of a dark gray.

After the article has thoroughly dried, it is immerged into an engobe bath. This engobe bath is a color bath, giving the color background. Large tubs are used in which the color, desired for the background of the articles, is prepared. There are two basic engobe baths, a white and a red. These two colors both come from natural clays. The white comes from a clay which is called "matiz," but it is a different clay from the hard white clay used in making the articles. The red clay is called "barro colorado" and is a sticky clay. The particular clay desired for the color is dissolved to make a water solution. If white is used, it is a milky white solution; if red, a red solution. The dried articles are dipped in the solution. They are then allowed to dry. The red and the white colors are natural, but when other colors are desired, artificial metal colors are used. In order to obtain a black color, the red engobe is mixed with oxide of manganese because the black clay is not black enough to make a black color.

The next process after the engobe bath is the decoration. At times the decorations are placed upon the articles before the first firing and sometimes afterwards. The body, however, is always given the engobe bath before the first firing, and sometimes it is also decorated.

The kilns used in the firing are small ovens which may be heated to the desired intensity. They put the articles in these ovens and just bake them. When the articles are baked, the color will change to a lighter shade, and more of a tan color. If the walls of the article are thick and the heat does not penetrate to the center, a dark line will show therein, but the inside and outside surfaces both will show a lighter tan color than the original unbaked articles, which are gray.

Articles which are intended to be glazed will have a second firing after the glaze has been applied. Unglazed articles are only subjected to one firing. Articles subjected to glazing are first given a glaze bath. The glazing solution is composed of oxide of lead, water, and a special clay, which is called "liga." Liga is also known as "flor del barro," meaning "flower of the clay." This flower of the clay is made by dumping a certain quantity of the black and white

clay into a container of water. The largest portion of it sinks to the bottom of the container. A certain portion, however, remains suspended in the water. This suspended portion is called the flower of the clay and is emptied into another container to settle. After settling, the water is removed and the clay remaining is the "liga."

The witness was interrogated concerning plaintiff's exhibit 3, the water carafe. He recognized it as Mexican earthenware, having an engobe finish. He testified that it had been treated with a white engobe, having red and other colored decorations over the engobe. He stated: "I can see from here that the body is different from the engobe."

X Q. What else do you see that causes you to say there is an engobe there? Can you confine it to just looking at the top; is there a layer of color?—A. Yes, from the top I would say it is decorated over the engobe.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. I take it then this article had been formed with clay and then dipped in a solution of a whiter clay and then, after drying, is decorated with the figures and all such as appear here in brown, red and those other colors; is that it?—A. Yes, sir. However, I cannot tell whether the decoration has been made before or after the firing. It looks to me as if it had been made before the firing and this is not a glazed article. It has had only one firing.

Defendant's witness submitted 21 exhibits illustrative of the various clays, adobe colors, mineral glaze and clay used therein, and pieces of manufactured pottery. The description thereof appears as follows:

Collective exhibit A–1 is a sample of crude white clay, called Barro Tieso Blanco, a nonpegajoso clay, secured by the witness from the Zalatitan pit about 3 miles from Tlaquepaque.

Exhibit A–2 is a sample of crude black clay, called Barro Negro Pegajoso, obtained by the witness from the El Camuchin pit near Tlaquepaque. The witness described these two clays as "pretty close to being the same color." However, an inspection of these samples discloses that they are distinguishable in color, the white clay being a few shades lighter.

Exhibit A–3 is a sample of crude red clay, the Barro Tieso Colorado Pegajoso, taken by the witness from the Pueblo de Santa Cruz pit near Tonala. This sample is distinctly of a brick-red color.

Exhibit A–4 represents equal parts of a black and white clay which have been powdered, obtained by the witness from Juan Ruelas Allende, a homeworker. The sample is a dark grayish coarse powder.

Exhibit A–5 was described as a prepared white and black powdered clay to which water had been added, after which it had been kneaded. The witness took this sample from the worker's table of Encarnacion Melchior. It consists of a hard mass in the shape of a cylinder and is a dark gray material.

Exhibit A–6 was described by the witness as crude white clay known as "Matiz" from which the white engobe bath is prepared.

The witness obtained this sample from the Huentitan pit near Tonala. The clay in this sample is in small lumps. It is dark gray in color but has a reddish cast and is neither the color of the crude white nor the crude black clay of collective exhibit A–1 and exhibit A–2.

Exhibit A–7 is a powdered brick-red clay, described by the witness as the crude clay of exhibit A–3 ground into a fine powder and used for the purpose of making the red engobe. The witness obtained the sample from the Indian worker, Salvador Tornero. This powder appears to be ground much finer than the white and black powdered clay sample.

Exhibit A–8 is described as parts of an article which had been fashioned, dried, then dipped in red engobe, but not subjected to firing. The witness obtained the sample from Salvador Tornero, and pointed out the engobe as being the reddish color on the surface. The clay in these broken pieces appears to be about the same color as the white and black powder except for one surface which has a thin reddish coat.

Exhibit A–9 is described as parts of an article which has been fashioned, dried, dipped in red engobe, and then fired, also obtained from Salvador Tornero. Although the reddish surface is about the same color, the clay pieces are very much lighter than exhibit A–8 and have more of a tan cast rather than gray.

Exhibits A–10 to A–15, inclusive, represent colors for engobe and for decorations, to wit, green, yellow, black, rose, deep blue, and light blue, respectively, which the witness obtained from the Indian worker, Simon Gonzalez. They are very finely ground powders.

Exhibit A–16 was described as an article which had been fashioned, dried, dipped in white engobe, painted with red engobe, and then subjected to the first firing. The witness obtained the sample from Simon Gonzalez. It is composed of broken pieces of pottery. The portions representing the inside surface of the article are light gray in color but from the interior, as seen by the broken cross-section, the color changes as it approaches the exterior. The outer surface of the pieces, in appearance, is quite comparable to plaintiff's exhibits 3, 4, 6, 7, and 8, *supra*.

Exhibit A–17 was described as a mineral glaze which the witness obtained from Simon Gonzalez. It is a reddish-tan coarse powder, not in any manner resembling the various clays in evidence.

Exhibit A–18 was described as clay "liga," which is used in the glaze. It is a very fine grayish powder.

Exhibit A–19 was described as parts of articles, fashioned, dried, decorated in the crude state, fired, glazed, and then subjected to a second firing. The pieces of pottery here have thereon a high gloss on the exterior portions of the surface much the same as plaintiff's

exhibit 1. It is decorated in green, brown, blue, and white, and appears to have had an engobe of white first applied.

Exhibit A–20 was described as pieces of an article having a natural body color, parts of which were decorated in the crude and then fired. The interior and outer portions of the surface have the same appearance, with no gloss whatever. The article and plaintiff's exhibit 2 are comparable in appearance, as far as the exterior surfaces of the article are concerned.

Exhibit A–21 was described as having a natural color body with parts of the article decorated in the crude, then fired, after which it was glazed and finally subjected to the last firing. This article which is in broken pieces appears to have been made of a red clay and is the same color all the way through the cross-section. The outer surface, where not touched by the glaze, is plain dull reddish in color, but where glazed, it is a darker shade and, of course, presents a glazed surface.

Counsel for the plaintiff contends that the uncontradicted testimony of the importer establishes that the merchandise in question consists of common yellow, brown, red, or gray earthenware; that the merchandise has a body wholly of clay, both witnesses agreeing that nothing but clay and water were added in the process of manufacture and that it is the clay taken from one pit; that the clay is unwashed and not artificially colored. It is further contended that the clay is unmixed, for the reason that it is not a blend of clays from different pits; that the difference between the white clay and the black clay is not one which concerns the essential qualities of the clay. It is argued that Congress did not contemplate that the combination of portions of clay from the same deposit, part of which was wet and part dry, would result in a mixed clay, but more probably the term refers to the paste formulas to be found in the pottery industry, which are combinations of as many as a dozen different materials, such as talc, kaolin, feldspar, silica, fuller's earth, etc., in definite proportions. It is further argued that the testimony of the Treasury representative is of little value because he visited only three or four clay pits and observed only four of the homeworkers in his 2 weeks' stay in the Tlaquepaque vicinity.

Counsel for the Government contends that the plaintiff has failed to identify the imported articles with any of the exhibits 1 through 8; that the plaintiff has failed to prove that the earthenware in question comes within the class of "common"; and it is further contended that the bodies of the instant articles are composed of mixed clays, being a combination of the "pegosa" (sticky) and "nonpegosa" (nonsticky) clays.

In the case of *Arconti Hardware Co.* v. *United States, supra,* incorporated with and made a part of the record herein by consent of the parties, this court held that such articles as water bottles, decanters, pitchers, water carafes, flasks, pig banks, and ashtrays were commonly used in the home for utilitarian purposes, and came within the meaning of common earthenware. Upon the basis of the uncontradicted evidence presented in that case, it was further held that the yellow, brown, red, or gray earthenware there in question was composed of a body wholly of clay which was unwashed, unmixed, and not artificially colored.

Rule 20 of the rules of this court makes provision for the incorporation in evidence of the records in former cases only when the pending case involves questions of law and fact substantially the same in character as in such decided cases. It has been held that the consent of the parties as to such incorporation, or the failure to object on behalf of one of the parties thereto, "might reasonably be considered as an admission" that the articles the subject of the controversy in both cases were of the same kind. (See *United States* v. *American Bead Co.,* 7 Ct. Cust. Appls. 132, T. D. 36456.) In view of the fact that the parties to the controversy herein agreed to the incorporation of the *Arconti* case, *supra,* and it was held in that case that the articles were composed wholly of clay and commonly used for utilitarian purposes, the Government's contention that it has not been established that the articles in question were articles of common earthenware is without merit. Neither can it be held that the plaintiff has failed to identify the imported articles with any of the exhibits 1 through 8 for the reason that such exhibits were accepted without objection at the time of trial as representing the articles imported.

The only question remaining is whether or not the clay articles are composed of unmixed and unwashed clay. The evidence is quite contradictory as to the nature of the clay itself, where it is procured by the Indians, and the manner in which the pottery is manufactured by by the homeworkers. For that reason, the testimony of the two witnesses has been carefully noted.

In making provision for merchandise under paragraph 210, Congress specified that the body of the article shall be composed wholly of clay. If it had intended to refer to combinations of talc, kaolin, feldspar, silica, fuller's earth, etc., as argued by counsel for the plaintiff, the Congress would not have used the term "wholly of clay."

In the absence of evidence establishing that there is a difference between the common meaning and the trade meaning of the term "unmixed," the tariff term must be taken in its ordinary signification. The prefix "un" is used to express negation, and when attached to the

word "mix" it refers to an article as not mixed. The word "mix" is defined in Funk and Wagnalls New Standard Dictionary, page 1590, in part as follows:

**mix,** * * * **I.** *t.* **1.** To cause to unite promiscuously into one mass, assemblage, or body; * * * mingle so as to render separately indistinguishable; * * *

\* \* \* \* \* \* \*

**3.** To produce by incorporating different ingredients; make by mingling; as, to *mix* dough.

\* \* \* \* \* \* \*

**II.** *i.* **1.** To become promiscuously united or blended; become incorporated together into one body; * * *

\* \* · \* \* \* \* \*

The question arises as to whether or not the "pegosa," or black sticky clay, and the "nonpegosa," or white clay, which is not sticky, when mixed together, should be regarded as a mixture of two clays, inasmuch as both types are taken from the same clay pit, and particularly when the combination thereof simply returns the clay to what was supposed to be its original condition.

Through seepage of water or some other condition, the nonpegosa and the pegosa clay, originally one and the same thing, were rendered distinguishable, not only through the color thereof, but also through different characteristics. Both witnesses agree that the white clay and the black clay are mixed together, although the method of mixing is not agreed upon, and that it is necessary to mix them in order to produce the articles in question. The one which is a nonsticky clay, the plaintiff characterized at one point in his testimony as not a clay, but just dirt, and admitted that the other was a sticky clay. Although both types of clay came from the same pit, according to the Government witness, they were removed separately, transported upon separate burros to the Indian homeworkers' patios, dried separately, then mixed together in certain proportions, and the combined clays were then pulverized into an inseparable mixture.

In view of the evidence adduced in this case, and irrespective of the decision in the *Arconti* case, *supra*, to the contrary, this court is of opinion that the clays from which the articles in question were manufactured, although unwashed and not artificially colored, were mixed, and, therefore, the articles in question are excluded from paragraph 210, *supra*, and come directly within the description of the earthenware articles in paragraph 211, as amended, *supra*, as having a body not artificially colored and composed wholly of clay, as assessed with duty by the collector at the rate of 5 cents per dozen pieces and 25 per centum ad valorem.

For the reasons stated, judgment will be entered in favor of the Government.